# Authority of the Secretary of the Treasury Regarding Postal Service Bond Offering

If the Secretary of the Treasury, within the fifteen-day period following notice by the United States Postal Service of a proposed bond issue, declares his election to purchase the bonds under 39 U.S.C. § 2006(a), the Postal Service may not sell the bonds on the open market, but must instead negotiate in good faith with the Secretary to reach agreement on the terms and conditions of a sale to the Secretary

Transfer of the proceeds of any bond offering by the Postal Service to a trustee for the purpose of having the trustee make payments on outstanding Postal Service debt would be a deposit of Postal Service monies within the meaning of 39 U.S C. § 2003(d) and, accordingly, could be done only with the approval of the Secretary of the Treasury.

January 19, 1993

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

You have requested our opinion concerning the authority of the Secretary of the Treasury under 39 U.S.C. §§ 2003(d) and 2006(a) to purchase bond issues of the Postal Service and to control the disposition of the proceeds thereof. Specifically, we were asked to address the legal issues arising from the proposed bond issue described in Postmaster General Runyon's October 7, 1992, letter to Secretary Brady. Although we understand that Treasury and the Postal Service have reached an agreement, in consequence of which the Postal Service has withdrawn this particular bond issue, we are memorializing our legal conclusions in this memorandum because of the recurring importance of these issues.

The Postal Service's plan was to issue bonds in the amount of $3 billion. The Postal Service proposed to transfer the proceeds of the bond issue to a trustee who would then purchase an equivalent amount of government securities, the interest and principal of which would be dedicated to repayment of approximately $2.6 billion of Postal Service debt held by the Federal Financing Bank ("FFB"). Under a ruling of the Financial Accounting Standards Board, this transaction would have allowed the Postal Service to remove the original FFB debt from its books, producing, the Postal Service asserted, cost savings and financial flexibility.

The Postal Service gave notice to the Secretary of the Treasury of its intent to market these bonds, as required by 39 U.S.C. § 2006(a), on October 7, 1992. On October 9, 1992, the Secretary notified Postmaster General Runyon that he was exercising his statutory option to purchase the bonds, and proposed that the Postal Service immediately enter into negotiations concerning the terms of the sale. The Secretary believed that his invocation of his right to purchase within the fifteen-day

6

, period precluded the Postal Service from offering its bonds in the market. The Postal Service took the position that the Secretary's failure actually to purchase the bonds within the notice period permitted it to market them elsewhere.

For the reasons set forth in this memorandum, we believe that the Secretary's election to purchase the bonds within the fifteen-day period precluded the Postal Service from selling the bonds on the open market. The Secretary's election triggered an obligation of both parties to negotiate in good faith to agreement on the terms and conditions of the sale.

We further conclude that the transfer of the proceeds of any bond offering by the Postal Service to a trustee for the purpose of having the trustee make payments on outstanding Postal Service debt would have been a "deposit" of "moneys of the [Postal Service] Fund" in a place other than the Postal Service Fund within the Treasury within the meaning of 39 U.S.C. § 2003(d). Such a deposit would, under that statute, be subject to "the approval of the Secretary [of the Treasury]." *Id.* § 2003(c).

## I.

The right of the Secretary of the Treasury to purchase obligations of the Postal Service arises under statute:

> At least 15 days before selling any issue of obligations under section 2005 of this title, the Postal Service shall advise the Secretary of the Treasury of the amount, proposed date of sale, maturities, terms and conditions, and expected maximum rates of interest of the proposed issue in appropriate detail and shall consult with him or his designee thereon. The Secretary may elect to purchase such obligations under such terms, including rates of interest, as he and the Postal Service may agree, but at a rate of yield no less than the prevailing yield on outstanding marketable Treasury securities of comparable maturity, as determined by the Secretary. If the Secretary does not purchase such obligations, the Postal Service may proceed to issue and sell them to a party or parties other than the Secretary upon notice to the Secretary and upon consultation as to the date of issuance, maximum rates of interest, and other terms and conditions.

39 U.S.C. § 2006(a).

Congress's dual purpose in enacting § 2006(a) was to give the Postal Service the powers necessary to run the Service on a business-like basis, while also providing some protection for the Treasury against a Postal Service debt offering that might interfere with the Treasury's marketing of its own bonds. The first policy, as stated in the report of the House Committee on Post Office and Civil Service on

7

the bill that ultimately became the Postal Reorganization Act, was that postal reorganization rested upon the proposition that "the management of the Postal Service should be given the powers needed to manage well and then should be held strictly responsible for the proper use of those powers." H.R. Rep. No. 91-1104, at 20 (1970) ("House Report"). Because Congress recognized that "access to capital through the sale of bonds is essential to any realistic modernization of the physical plant of the Postal Service," the reorganization bill gave the Postal Service "the power to issue its own obligations upon the security of such of its assets and revenues as it sees fit." *Id.* At the same time, Congress recognized that the Treasury might need some protection from competition from the Postal Service. As then-Under Secretary of the Treasury Paul Volcker testified before a Senate committee, the Treasury "does not want to be put in the position of the Postal Service being able to do financing independently and perhaps working at cross purposes with what the Treasury is trying to accomplish at that same time in other financing operations." 1 *Postal Modernization: Hearings Before the Senate Comm. on Post Office and Civil Service*, 91st Cong. 311-12 (1969) ("Senate Hearings").

Section 2006(a) seeks to harmonize these concerns. The Postal Service was given the authority to determine for itself (subject, of course, to the concurrence of the market) the purposes, amounts, and terms and conditions of its borrowings, while the Treasury was provided a mechanism for coordinating Treasury and Postal Service financing. Under Secretary Volcker called this compromise an attempt to achieve "the best of both worlds . . . . The Secretary of the Treasury cannot assert substantive control over the Postal Service, but the Postal Service must coordinate its financial demands with the Treasury." Senate Hearings at 312. Similarly, the report of the House Post Office Committee explained:

> [T]he power of the Postal Service to issue its obligations is reserved to it alone. It need not seek or obtain the consent of the Secretary of the Treasury either as to the fact of the borrowing or the terms and conditions upon which it is done. There is a duty upon the Service to notify and consult with the Secretary. This, together with the right of the Secretary to purchase any or all of a proposed issue, is regarded by that Department as fully adequate protection of the interest of the United States Government as a potential competitor of the Service in the money market. At the same time, the bill guards against any inappropriate power in the Treasury to control the scale of Postal Service operations.

House Report at 21.

Although the legislative purpose behind § 2006(a) is clear, the statute itself is not. At least three readings of § 2006(a) are possible. Under the first reading, what might be called the "notice and consultation" view, the Postal Service is re-

quired to give notice to the Secretary at least fifteen days before a planned bond sale. The notice must contain certain specified information (amount, proposed sale date, maturities, etc.), but is not itself an offer to sell to the Secretary. The Secretary may purchase these bonds with the agreement of the Postal Service ("under such terms . . . as he and the Postal Service may agree"), but the Secretary is not obliged to buy, and the Postal Service is not obliged to sell. Finally, if the Secretary does not purchase the bonds, even if the failure to purchase is simply a consequence of the Postal Service's refusal to sell, the Postal Service may sell the bonds elsewhere, subject only to the requirements that it give the Secretary notice of any such sale and consult with him concerning its terms.

The second possible reading may be termed the "right of first refusal" reading. Under this interpretation, the Postal Service must give the Secretary fifteen-days advance notice of a proposed sale of obligations. The notice must, of course, contain the information specified in the statute "in appropriate detail," and constitutes an offer to the Secretary. Prior to the expiration of the fifteen days, the Secretary may exercise his option to purchase the obligations on the terms offered, or on such different terms as he and the Postal Service may have agreed. Once the Secretary exercises his option, the Postal Service is bound to sell to him under the terms of its original offer or any mutually acceptable counteroffer. Should the Secretary fail to complete the purchase within the fifteen-day period, however, the Postal Service would be free to market its bonds elsewhere, after notice to and consultation with the Secretary.

The third reading of § 2006(a) might be referred to as the "exclusive bargaining right" theory. Under this view, the Postal Service must give the Secretary notice of its proposed offering, in appropriate detail, at least fifteen days prior to the sale. The Secretary may then decide to require the Postal Service to market the securities exclusively to him. If the Secretary exercises this option within the fifteen-day period, the Postal Service must negotiate to agreement with the Secretary, and only with the Secretary, on the terms and conditions of the sale. There is no limit on the negotiation period, and although each party must act in good faith, the Secretary's exercise of his exclusive bargaining right precludes the Postal Service from negotiating with other buyers. Only if the Secretary subsequently relinquishes this right may the Postal Service offer its bonds on the market.

None of these readings is entirely free from difficulty. As an initial matter, however, we may dismiss the first interpretation, the notice and consultation model. Although this version is perhaps most easily reconciled with the wording of § 2006(a), it is totally at odds with the purpose of the provision, which is to give the Secretary a "right of first refusal." *See, e.g.*, Senate Hearings at 305 (testimony of Under Secretary Volcker); 3 *Post Office Reorganization: Hearings Before the House Comm. on Post Office and Civil Service*, 91st Cong. 1172 (1969) ("House Hearings") (colloquy between then-Under Secretary Volcker and Representative Hamilton); *see also* House Report at 21 (Secretary has "the right . . . to purchase

any or all" Postal Service obligations); Senate Hearings at 270 (testimony of Post-master General Blount) (Treasury has right to purchase all Postal Service obliga-tions or, at its option, to permit Postal Service to sell obligations to the public); *id.* at 305 (testimony of Under Secretary Volcker) (Secretary has an option to pur-chase Postal Service obligations); *Federal Financing Bank Act: Hearings Before the House Comm. on Ways and Means*, 93d Cong. 18 (1973) (testimony of then-Under Secretary Volcker). Indeed, the Postal Service itself recognizes that § 2006(a) creates some species of an option right in the Secretary of the Treasury. *See* Memorandum from Mary S. Elcanco, Vice President and General Counsel, United States Postal Service at 9 (Oct. 22, 1992) (referring to the Secretary's "right of first refusal") ("Elcanco Memo"). Thus, the first reading, requiring only notice to and consultation with the Secretary, is not a viable interpretation of § 2006(a).

Under either the second or third reading of § 2006(a), the Secretary must exer-cise his right (either the right of first refusal in the second reading or his exclusive bargaining right in the third) within the fifteen-day period following notice of a proposed Postal Service offering. Although the statute does not explicitly make the Secretary's right time-limited, the very notion that the Secretary has an option to be exercised suggests that there must be some point in time at which he must decide to exercise or waive his option. Moreover, if the Secretary's right were not subject to a time limit, the Secretary could by mere inaction prevent the Postal Service from obtaining *any* financing. As Under Secretary Volcker put it, how-ever, § 2006(a) gives the Secretary the authority "to supervise the timing of the financing and the terms of any financing by the postal authority, but he can never put himself in a position where he is preventing the postal authority from obtaining what financing they think is necessary." Senate Hearings at 311. Thus, the Secre-tary's option, whether viewed as the right to purchase Postal Service obligations or to enjoy exclusive bargaining power, must be subject to some time limitation. The fifteen-day notice period contained in the first sentence of § 2006(a) must therefore be read as the time limit for the Secretary to exercise his option right.

Assuming that the Secretary must exercise his option right within the fifteen-day period, two questions remain. First, what is the nature of the option right? Is it a right of first refusal, i.e., the right to purchase the Postal Service's obligations on the terms contained in the original notice or as modified by agreement, or is it a right to require the Postal Service to bargain exclusively with the Secretary con-cerning the sale of the obligations? Put another way, can the Secretary "elect to purchase" Postal Service obligations only *after* he has reached agreement with the Postal Service on the terms and conditions of the sale (the right of first refusal the-ory), or can he make his election *prior* to any agreement on terms (the exclusive bargaining rights theory)?

We believe that § 2006(a) should be read as giving the Secretary the right to "elect to purchase" Postal Service obligations prior to any agreement on the terms of the sale. The statute states that the Secretary "may elect to purchase such obli-

10

gations under such terms, including rates of interest, as he and the Postal Service may agree." *Id.* The right of first refusal theory would interpret this phrase as if it read "may elect to purchase . . . under such terms . . . as he and the Postal Service may *have agreed.*" If that had been the language of the statute, the construction would clearly indicate that the agreement on terms must precede the Secretary's election. The failure to use that construction, however, suggests that the Secretary's election may precede any agreement between the parties. We therefore read the statute to mean quite literally what it says, that the Secretary may elect to purchase upon such terms as he and the Postal Service may subsequently agree.

## II.

Assuming that the Postal Service had proceeded with its proposed financing, either through a purchase by the Treasury or via open market sales, several questions concerning the Secretary's authority as it affected the proposed defeasance would still have remained. We understand that the Postal Service planned to deposit the proceeds of its financing in the Postal Service Fund of the Treasury, and then almost immediately to withdraw the funds and transfer them to a trustee. The trustee in turn would have purchased a portfolio of government securities, whose principal and interest would have been sufficient to redeem approximately $2.6 billion of Postal Service debt held by the FFB.

As outlined above, the proposed defeasance raises questions under 39 U.S.C. § 2003(c) and (d).[1] First, would the transfer of the proceeds of the Postal Service financing have been a "deposit" of funds within the meaning of § 2003(d)? If it would, then under the statute the deposit would have required the approval of the Secretary of the Treasury. Second, would the purchase of the portfolio of government securities by the trustee have been an "investment" of funds "in excess of current needs" by the Postal Service?

Turning first to the issue of whether the transfer to the trustee would have been a "deposit" within the meaning of § 2003(d), we have no hesitation in concluding that it would. To "deposit" is defined as "[t]o commit to custody, or to lay down; to place; to put; to let fall (as sediment)." Black's Law Dictionary 438 (6th ed. 1990) (citing *Jefferson County ex rel. Grauman v. Jefferson County Fiscal Court,* 117 S.W.2d 918, 924 (Ky. 1938)); *see also id.* (defining a "deposit" as "[t]he delivery of chattels by one person to another to keep for the use of the bailor"). Here,

---

[1] 39 U.S.C § 2003(c) provides

    If the Postal Service determines that the moneys of the Fund are in excess of current needs, it may request the investment of such amounts as it deems advisable by the Secretary of the Treasury in obligations of, or obligations guaranteed by, the Government of the United States, and, with the approval of the Secretary, in such other obligations or securities as it deems appropriate.

39 U.S.C. § 2003(d) provides:

    With the approval of the Secretary of the Treasury, the Postal Service may deposit moneys of the Fund in any Federal Reserve bank, any depository for public funds, or in such other places and in such manner as the Postal Service and the Secretary may mutually agree.

the Postal Service would have been committing the proceeds of its financing to the custody of the trustee with instructions, contained in an irrevocable declaration of trust, to use those proceeds for the benefit of the Postal Service by paying certain Postal Service obligations as they came due. Such a transaction would have involved what appears to us to be the essential ingredient of a deposit: the holding by one person of money that belongs to another, for that other person's benefit.

The Postal Service argues that to "deposit" funds necessarily implies the right to withdraw them and that, since the Postal Service would have had no such right here, the transfer to the trustee could not be a deposit. It is true that in many, perhaps even in most, deposit situations the depositor has a right to withdraw his funds. But the right to withdraw is not therefore an inherent attribute of a "deposit." For example, a prospective purchaser of a house usually is required to put a sum of money on deposit with an escrow agent. This money, usually called "earnest money," is not withdrawable by the purchaser and, indeed, is forfeited to the seller if the purchaser does not proceed with the sale. A deposit is often required of renters of either real or personal property. This deposit is not withdrawable by the renter, but is, of course, returned to him at the conclusion of the transaction. Similarly, many utility companies require customers to post a deposit as a condition of initiating service. Once again, this deposit may not be withdrawn by the depositor, but is returned to him only upon discontinuance of his service or upon the utility's becoming satisfied of his creditworthiness. Thus, it does not appear that the ability to withdraw on demand is an essential attribute of a deposit.

The proposed transfer of funds to the trustee would clearly have been, in our opinion, a deposit of those funds within the meaning of § 2003(d). It is indisputable that § 2003(d) provides that any deposit of Postal Service funds in any place other than the Postal Service Fund of the Treasury requires the approval of the Secretary of the Treasury. We therefore conclude that the Postal Service may not have implemented this aspect of its proposed defeasance without the Secretary's approval.

If the Secretary had consented to the deposit of funds with the trustee, it still would have been necessary to determine whether the purchase of a portfolio of government securities by the trustee would be subject to the requirements of § 2003(c). That section provides that if the Postal Service desires to invest any funds "in excess of current needs" in government securities, it may request the Secretary of the Treasury to do so on its behalf. Should the Postal Service wish to invest in other than government securities, it must first obtain the approval of the Secretary.

The Postal Service argues as an initial matter that § 2003(c) would have been inapplicable here because the proceeds of its financing would not have been excess funds within the meaning of the statute. The Postal Service contends that since § 2003(c) by its terms applies only to the investment of excess funds, investment of any other funds is left to the discretion of the Postal Service.

12

We believe that § 2003(c) provides the only statutory authority for the investment of Postal Service funds. Certainly there is no express authority elsewhere in title 39 for the Postal Service to invest its funds. Although the broad powers granted to the Service by 39 U.S.C. § 401 might, in the absence of § 2003(c), be construed to give the Service investment authority, the specific, limited authority granted by the latter provision precludes such a reading of the former section. We believe that this situation is clearly governed by the maxim *expressio unius est exclusio alterius.* By explicitly providing for the investment of excess funds, the statute impliedly denies the Postal Service the power to invest any other moneys. Indeed, it is difficult to imagine the purpose of § 2003(c) if the general powers granted in § 401 included the power to invest; there would seem to be little reason to place special limits on the power to invest excess funds, while leaving the Postal Service free to invest funds needed for current operations in any way it chose. Both common sense and the standard principles of statutory construction suggest that the Postal Service's only source of authority to invest its funds derives from § 2003(c).

Since the Postal Service may invest only pursuant to § 2003(c), it may not invest at all, with or without the Secretary, unless the funds proposed to be invested are "moneys . . . in excess of current needs." The Postal Service argues that the proceeds of its financing would not have been funds in excess of current needs because it "intend[ed] to use the funds to effect the Defeasance (a valid business purpose)." Elcanco Memo at 18. We believe, however, that such a bootstrapping argument is not persuasive. The funds at issue would have been raised solely for the purpose of investing, through the trustee, in a portfolio of securities. If investment were considered a current need within the meaning of § 2003(c), the Postal Service could never invest *any* money, because money used for investment would be used for, and thus by definition never could be in excess of, current needs. It must therefore be the case that "current needs" excludes investment purposes. Since it is clear that the Postal Service would not have required these funds for its current operations apart from its defeasance scheme, we believe that the proceeds of this financing could be considered excess funds within the meaning of § 2003(c).

We note, however, that § 2003(c) clearly vests in the Postal Service the right to determine which funds are "in excess of current needs." We therefore conclude only that, if the Postal Service were to have requested investment of the proceeds of its proposed financing, the Secretary of the Treasury would have been legally authorized by § 2003(c) to invest such funds on its behalf. The Postal Service would have been free, however, to determine that these funds were not in excess of current needs, in which event the Postal Service would have been precluded from investing them in any manner.

The Postal Service also disputes that the purchase of securities pursuant to the defeasance scheme would have constituted an investment of funds. The Postal

Service argues that the defeasance would have been the economic "equivalent of delivering the proceeds to Treasury to prepay the FFB debt." Elcanco Memo at 19. Granted that that would have been the accounting effect of the defeasance, we do not see how that divested the purchase of the portfolio of securities of its investment character.

Investment means "an expenditure to acquire property or other assets in order to produce revenue." Black's Law Dictionary 825 (6th ed. 1990). It has also been defined judicially as "[t]he placing of capital or laying out of money in a way intended to secure income or profit from its employment." *Id.* (quoting *SEC v. Wickham*, 12 F. Supp. 245, 247 (D. Minn. 1935)) (quoting *Minnesota v. Gopher Tire & Rubber Co.*, 177 N.W. 937 (Minn. 1920)). There is no question that the Postal Service proposed to expend capital raised through its debt offering to purchase government securities in the expectation that that property would produce income in the form of dividends. That the Postal Service had an ultimate use in mind for both the principal amount of its investment and the income derived therefrom in no way changes the fact that it would have been expending its capital in the first instance for the purpose of producing income. That would have constituted an investment and thus would have brought the transaction within the scope of § 2003(c).

Although this point was not raised by the Postal Service, we note that the investment, i.e., the purchase of the securities, would not have been accomplished by the Postal Service itself, but by the trustee. It must therefore be determined whether the trustee under these circumstances would have been subject to the constraints of § 2003(c) in the same way that the Postal Service would be if it purchased the securities directly.

We believe that § 2003(c) would have applied to the trustee here. It is clear that the trustee would have exercised no discretion in this matter. He would have been required by the terms of the declaration of trust to purchase risk-free, i.e., government-issued or government-insured, securities, in amounts and with maturities and interest rates that corresponded precisely to the amounts and maturities of the Postal Service debt to be defeased. Far from exercising the independent judgment characteristic of a trustee, the trustee here would have been nothing more than the agent of the Postal Service. Since the agent could exercise no more authority than his principal possessed, we conclude that the trustee would have been subject to the provisions of § 2003(c) in the same manner that the Postal Service itself would be.

In summary, we conclude that the proposed defeasance scheme would have been fully subject to § 2003(c) and (d). The transfer of the proceeds of the Postal Service's financing to the trustee would have constituted a deposit within the meaning of § 2003(d), and therefore could have been done only with the approval of the Secretary of the Treasury. Assuming that the Secretary agreed to such a deposit, the purchase of the portfolio of securities by the trustee would have con-

stituted an investment of Postal Service moneys within the meaning of § 2003(c). That section requires that the Postal Service, or its agent, invest in government securities only through the Secretary of the Treasury. Although the Secretary could not have refused a request by the Postal Service to invest in government securities, he would have had discretion to determine which particular securities to purchase. *Postal Reorganization Act -- Investment of Excess Funds of the Postal Service*, 43 Op. Att'y. Gen. 45, 48 (1977).

TIMOTHY E. FLANIGAN
*Assistant Attorney General*
*Office of Legal Counsel*